Bell, J.,
dissenting:
I have such implicit confidence in the integrity and sound judgment of my associates that it would be a struggle for me to dissent from their conclusion if I were not convinced that they, unwittingly, do a great injustice to the appellant, Nellie Fagan, through the misapplication of a technical rule of evidence to a state of facts, to which, I think, it was never intended to apply; and, further, my associates and the trial court, as I understand it, agree with me that the result of the judgment carries with it injustice, because of the supposed irnpotency of the court to invade what the majority think an impregnable line of court decisions and precedents, preventing them from doing what they should like to do, if legally possible.-
October 8th, 1891, J ames Davenport, a hard working and saving colored hod-carrier, married Ella Kaseby, an equally hard working and saving colored laundress. The wife brought to the marriage a three-year-old daughter, now the appellant herein, and $500 in cash, and immediately after the marriage, she took up her residence and vocation in the city of Denver, working out as a laundress by the day, saving her earnings, and intensely persisted in her efforts for almost ten successive years, or until October 3rd, 1901, when she died, leaving her husband, the said James Davenport, and her said daughter, then about 13 years of age, as her sole heirs at law. The daughter, immediately upon the death of her mother, assumed the duties as housekeeper for Davenport, and faithfully attended to them for almost eight years, or until about April 8th, 1909, when Davenport died, leaving her in the *271 possession of lot 22, block 186, Stiles’ Addition to the City of Denver, with a little one-story brick house thereon, in which the family had lived ever sincé the marriage, and also left in her possesion about $1,500 in bank certificates. "When Davenport was married, he owned an undivided one-half interest in the lot and house before mentioned, and a colored friend of his by the name of Barnett owned the other half thereof. These two poor colored men purchased this home on the 7th day of November, 1887, for a consideration mentioned in the deed of $2,000, and gave, in part payment thereof, a trust deed for $1,550, which was released November 9th, 1889, and there is evidence tending to show that they borrowed some money fíom a real estate man, but the amount and security, if any, given therefor is not made known. Davenport admitted to a friend of his, one of the witnesses, that he was in debt when he married, and-that his wife let him have her money to pay for the home, and, notwithstanding this indebtedness and his meagre earnings, on November 16th, 1891, just a little more than one month after the marriage, he loaned Barnett $600, which was secured by a trust deed on Barnett’s interest in the property, and about two years afterwards he loaned him $800 more, which was likewise secured. Doubtless, both of these loans were made as a means of -buying Barnett’s interest in the property, as the title thereto was obtained by Davenport through those avenues on the 28th day of November, 1894, when the first trust deed to him was foreclosed, and the property purchased by him for the amount due on said trust deed, and expenses, and a deed immediately executed to him, as at that time there was no equity of redemption in this state from such sales. There is not a particle of evidence showing that the wife had a dollar of the money she brought to the marriage or any of her earnings' at the time of her death, except such as she was entitléd to *272 claim as her interest in the property, or, possibly, the bank certificates before mentioned, and in support of such claim there is plenty of evidence to the effect that the money she had at the time of the marriage and her subsequent earnings were invested in the property.
Victor Scruggs, who worked with Davenport for a period of about eight years, testified that Davenport told him about four or five months after the marriage that “his wife was going ahead with the property and keeping up the payments, for he wasn’t making a dollar; that was during the panic.” He further testified that the panic lasted about a year and a half, and that when Davenport did work, he did not earn over a dollar and a half a day, and that, in a conversation he had with him after the wife died, Davenport “commenced crying about his wife, how hard she worked and helped to pay for the place, and now, he says, # * * ‘I want Nellie to have this place when I die. * * * She has stayed here and her mother worked hard and has put more money in the place than I have, and I want her to have this place when I die.’ ”
Mr. Dwyer, a shoe man, and a particular friend and neighbor of the Davenports, testified that, shortly after the death of Davenport’s wife, Davenport told him that “her (Nellie Fagan’s) mother helped him make the money to get the property with and that he certainly, would see that she (Nellie Fagan) would have it,” and witness also testified that in a conversation with Davenport about two weeks before his death, Davenport told him that Nellie would get the property; “that she was entitled to it; that Nellie had worked hard since her mother died and helped him, and if it was not for Nellie and-her mother he wouldn’t be able to hold the property.”
Mahala Ming testified that Davenport and his wife “had purchased and owned their own home in Denver, *273 Colorado. They had both saved money from their work and my sister (Mrs. Davenport) took from Kirkwood, Missouri, when they were married about five hundred dollars which was put into the home. # * * She was a hard working, saving woman. She saved her money and improved the home and helped pay it out of debt.”
J. W. Barnett testified that the property was purchased by Davenport before the marriage, “and after the marriage Mrs. Davenport helped pay for it. * * * She was a hard working, saving woman. She was a laundress and worked out by the day and gave it to Mr. Davenport to pay on the property and support the family. ’ ’
Pat Ming testified that “Davenport visited me in Kirkwood * * ' * he told me that when he married •'Ella Barnett (appellant’s mother) he was in debt and she g’ave him money that she had previous to their marriage to help him out of debt for their home.”
The foregoing with other evidence was introduced on behalf of the appellant, and the trial judge, in his announcement, said:
“This is a ease that illustrates that hardships may arise under the law. If there ever was a case that appeals to a sense of moral justice, this one does, on behalf of the defendant here. I think that the evidence shows that this girl, at two or three years of age, was taken into this family, and that her mother brought somewhere about $500, which went into the family funds. The mother worked for years at hard labor, and her earnings went, so far as the evidence in the case shows, in the same way, and the deceased got the benefit of it all, and it is an extremely harsh matter and a great moral injustice that this girl cannot recover what she should be entitled to at least; that is, the proportion of the estate that was created by her mother. It is impossible for the court to determine, from this evidence, just how much of these *274 funds or earnings .went into the property. There is no evidence here of any definite amount having' gone in out of the $500. There is evidence here — plenty of it— to sustain the proposition that she had helped pay for this home. * '# * There is evidence to show that some time prior to this- — some time prior to her marriage — she had $500. The evidence shows that a month after the marriage the deceased made this loan, which is the source of his title to an undivided one-half of the property, and if this $500 could have heen traced into this loan this court would have held that there was an equitable lien there, provided there, had also been an arrangement shown that would rebut the presumption of law that obtains in dealings between husband and wife that these matters are, in the absence of any showing to the contrary, assumed to be gifts, which is a well established principle of law.” (Italics mine.)
If the courts are, in fact, as impotent as the criticisms of the learned trial judge would indicate, then the boasts of the chancellors throughout many generations, that “Equity will not suffer a wrong without a remedy, ” have been but tinkling cymbals, and of no substantial benefit. However, I do not think that the court is as powerless as the learned trial judge concluded in this case. He, unfortunately, labored under an erroneous assumption in holding that it “is well established principle of law” that, rathe absence of any showing to the contrary, the moneys or property of the wife received by the husband are assumed to be gifts. It is,, rather, a well established principle of law that, if a husband, upon whom rests a legal obligation to supply his wife with a home and maintenance, being out of debt, turns over his money or property to her, he will be presumed to have made a gift thereof. However, if the wife, upon whom rests no such primary legal obligation, places her money in her husband’s hands, and he invests it in realty and takes the *275 title in his own name, the presumption prevails that a gift is not intended, but that he holds the title in trust for her . — Wright v. Wright, 242 Ill., 71, 89 N. E., 789, 26 L. R. A. (N. S.), 161; Lloyd v. Woods, 176 Pa., 63, 34 Atl., 926; Kline v. Ragland, 47 Ark., 111, 14 S. W., 474; Title Ins. & Trust Co. v. Ingersoll, 158 Cal., 474, 111 Pac., 362, 363.
I think the trial judge also erred in holding that there is no evidence showing what amount, or when, any of the wife’s money was invested in the' property. Every necessary element of this case may be proven by circumstantial evidence, and, therefore, the trial court had a right to take into consideration the fact that Davenport was in debt when he married; that he was a hod-carrier working for low wages; that he was obliged to live out of his wages; and at times indulged in luxuries, such as intoxicating beverages; that the mother of the appellant brought to the marriage $500' in cash, about thirty days before the $600 loan was made; that, according to one of the witnesses at least, this $500 together with Mrs. Davenport’s subsequent earnings were invested in the property; that no other disposition of this money has been shown; that there is no evidence that any money was invested in the purchase of the property, except the $600 and $800 loans; that Davenport admitted during his lifetime that his wife helped to pay for the property, and had put more money into it than he did; that the property belonged to the appellant as much as it did to him during his lifetime; and that he intended that she should have the whole of it after his death, because of the unremitting toil, of his wife and the appellant in assisting in securing and maintaining the home, and had requested the witness Scruggs to go with him to a lawyer at an early date to will the property to her, but was soon' taken ill, and lived but a few days thereafter.
I think the above stated circumstances establish a *276 definite amount and time of investment on the part of the mother, and if, as stated hy the witness Scruggs, she had put more money into the property than Davenport did, this is definite to the extent of one-half of their combined investment; that is, if the two paid for the entire premises, and Davenport acknowledged that his wife paid more than he did, then it is definite that she paid for at least one-half thereof. As to the amount invested by her above one-half, it is indefinite; but the fact that she cannot recover the indefinite sum above one-half should not militate against her right, or the right of her heir, to recover the definite sum established. It is and always has been the policy of the law to give every reasonable presumption in favor of justice. Where this court is not bound by some legislative enactment, or decision of a higher court of this state on a like statement of facts, its first duty is to determine what would be substantial justice, then make every endeavor to find some approved legal or equitable way by which justice may be done. It is a severe reflection upon the courts when a judge feels bound to say, as was done in this case, that the judgment he renders carries with it “a great moral injustice.” We think the judge underestimated his power, and misconceived his duty when he entered judgment for the appellees while admitting that in “justice and good morals” they were not entitled to the same. We are told, however, that in establishing a trust like the one involved here, the evidence must be almost beyond a reasonable doubt in favor of the trust. This extreme rule applies where the justice of the case is uncertain. Every general rule has its numerous exceptions. It has always been abhorrent to the chancellor to permit injustice to prevail. It was the inadequacy of the law to furnish a remedy for every injury that called the court of equity into existence. In the formative period the chancellors recognized no difference between a moral and *277 a legal injustice, but were guided in their decisions by their consciences, and not by what has since been aptly termed the civil or judicial conscience of the court, but by their own individual consciences, by their moral sense apprehending what is right and wrong, by their own conceptions of good faith. — 1 Pomeroy’s Equity, 3rd Ed., sec. 50.
In this manner the first precedents were made, and continued until they had attained a reasonable completeness with respect to fundamental principles and general rules. This accumulation became the store-house whence the chancellors obtained material for their decisions, and both guided and restrained their judicial action. Equity is ever expanding its doctrines so as to cover new facts and relations, and has a power of orderly expansion, which cannot be lost without destroying its very nature.— Pomeroy’s Equity, supra, secs. 59-60. However, in the development of every judicial system, the people have been compelled from, time to time to destroy, by legislative acts, the controlling powers of precedents before such orderly expansion could maintain its continuing-growth.
The New York legislature in 1848 passed a most sweeping act termed “The Eeformed American System of Procedure” with the avowed purpose of destroying the supremacy of a multitude of unjust precedents, and to adopt the general equity theory of parties, and to .apply this system to the single civil action in all civil cases. The principles of this act became so popular that the legislatures of most of the states of the Union, and the British parliament soon adopted the same. Many leading-lawyers and influential benches gave the acts a.most narrow construction, and limited the intended liberal use of the principles. — Pomeroy’s Code Eemedies, 4th Ed., sec. 6. The legislative policy has been, and is, in the jurisdictions adopting the liberal procedure, that the court shall *278 see that justice is administered according to the liberalized reformed procedure'. It should not, now, be possible for a court, upon facts similar to those contained in this record, to announce, as the trial court did át the conclusion of the evidence, that “a great moral injustice’'’ is done to the appellant in his judgment then given against her. We have heard no denial from any of the judges that the well-worn finger prints of the mother of Nellie Fagan are indelibly imbedded in every fibre of this home secured after the marriage, and that the appellant is in “justice and good morals” entitled to at least one-half of the creation of her mother, but the majority of the. court seem to apply the strict rules of resulting trusts, properly applicable where the rights and equities are uncertain. In this case we have heard no one express a doubt that the prevailing equities were upon the side of the appellant. It is difficult for us to see, in the light of the equity precedents, built up by a long line of distinguished chancellors, the great underlying principles of which are natural justice and the moral code, how a majority of this court can consistently affirm a judgment which was rendered with a contemporaneous confession that it was in violation of “moral justice” and that it. was- ‘ ‘ an extremely harsh matter and a great moral injustice-that this girl cannot recover what she should be entitled to.” '
There are cases wherein statutory prohibitions force..' judges to award or-affirm what they believe to be “harsh- and unjust” judgments, but in this case the judges are not only free from legislative prohibition, but the very spirit of the “Beformed American System of Proceduré” adopted by our legislature demands that judgments shall be in harmony with, rather than in violation of, “ moral justice.” We know of no system which should uphold, such judgments, since the technical rigors of the common-law dominated the courts and the precedents- created *279 thereunder. However, this is an equity ease, and we understand that, by force of the equity rules and the reformed procedure,- the rigors of the common law have no application to the facts before us;
■ It may be thought that the appellant may present a simple claim against the estate for money had and received. This suit was brought May 19th, 1909. All claims against estates are required to be filed within a short time limit to entitle claimants to participate in the inventoried assets. When Nellie Fagan is driven from this court empty-handed, she will not only have lost • all interest in the home, in which her mother admittedly invested the net earnings of almost a life’s toil, to those who have never invested a penny therein, but will be mulcted in a large bill of costs that will probably consume her net earnings for many years, and it is not probable that this simple-minded colored girl will be disposed to hazard another long journey in courts which can give her no assurance of more substantial remedies than mere sympathy, while confessing that her claim is “morally just. ’.’
In fact, the machinery of the courts is so inordinately expensive that those of small affairs cannot expect to reap any real relief therethrough, if only one journey is required, and they may well expect to really lose, though the courts may announce a success, if the journey must bo doubled.
We think it the purpose of equity and the reformed procedure, that the courts shall, from the threshold to the termination of every suit .filed, make it a point of every effort that the controversy be decided and determined on the merits, in a single proceeding, and justice awarded in .the spirit of equity and the liberalized reformed procedure, oblivious of the musty precedents created by the technical rigors of the common law.
i-,-., yye do not believe,- with all due deference to the *280 majority of the court, that any technical rule of evidence, or any finespun technical distinction, as to whether the facts in this case bring it within the purview of an equitable lien or a resulting trust, is sufficient to justify the creation of the paradox exhibited in this case of having the moral rights of the appellant standing on one side of a dead line in defeat, and the appellees, confessed to be in the wrong by the trial court in its announcement, standing upon the other side, with their unrighteous cause supported by the decree of a court of equity.
Decided September 15, A. D. 1913.
Eehearing granted; judgment affirmed on rehearing, February 11, A. D. 1914.
Morgan, J., concurring.